JUDGE STANTON



EDWARDS ANGELL PALMER & DODGE LLP
Robert Novack, Esq.
750 Lexington Avenue
New York, New York 10022
(212) 308-4411
*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------
                                        :
ORCHID ISLAND TRS, LLC (formerly        :
known as Opteum Financial Services, LLC):
and BIMINI CAPITAL MANAGEMENT,          :   Index No:
INC. (formerly known as Opteum Inc.)    :
                                        :
                                        :
             Plaintiffs,                :
                                        :
    v.                                  :
                                        :   COMPLAINT
INDYMAC BANCORP, INC. and               :
INDYMAC BANK, FSB,                      :
                                        :
                                        :
             Defendants.                :
                                        :
------------------------------------    :
```

Plaintiffs Orchid Island TRS, LLC ("Orchid"), formerly known as Opteum Financial

Services, LLC, and Bimini Capital Management, Inc. ("Bimini"), formerly known as Opteum

Inc., by their attorneys, Edwards Angell Palmer & Dodge LLP, as and for their Complaint

against Defendants IndyMac Bancorp, Inc. and IndyMac Bank, FSB (collectively, "IndyMac")

allege as follows:

## NATURE OF THE ACTION

1.     This is an action for breach of contract, breach of the implied covenant of good faith and fair dealing, unfair competition, aiding and abetting breach of fiduciary duties, tortious interference with contract, and tortious interference with prospective economic advantage.

2.     Plaintiffs seek damages and other relief arising out of Defendant IndyMac's malicious, tortious raiding of Orchid's Northeastern Branch offices in Eatontown, Linden, Paramus, Mt. Arlington and Mt. Laurel/Woodbridge, New Jersey and Albany, New York. IndyMac tortiously solicited Orchid's agents/employees to engage in direct, unfair competition with Orchid, converted Orchid's confidential and proprietary information, tortiously interfered with Orchid's business, and aided and abetted breaches of fiduciary duty by Orchid's former branch managers.

3.     On or about March 16, 2007, IndyMac entered into a Confidentiality Agreement with Bimini whereby IndyMac was provided access to highly confidential and proprietary information regarding the compensation, benefits and sales performance of all employees of Orchid, a Bimini subsidiary engaged in, among other things, the retail mortgage loan origination business. IndyMac, which signed the confidentiality agreement as part of its consideration of a potential purchase of the operating platform, residuals, servicing rights and/or other assets relating to the subprime/prime residential mortgage origination business of Bimini (i.e., Orchid), agreed to use the confidential and proprietary information solely for the purpose of evaluating the merits of a possible transaction, and for no other purpose.

4.     When negotiations between the parties ended on or about May 7, 2007, IndyMac began the wholesale solicitation of key Orchid employees, including its branch managers, whose confidential compensation, benefits and performance records had just been provided by Bimini

- 2 -

to IndyMac, to leave Orchid and join IndyMac. IndyMac's unlawful misuse of the confidential information was designed to disrupt a pending transaction for the sale of Orchid's retail mortgage loan origination business to a third party, by stealing away its key sales and management employees on the very eve of consummation of that transaction. IndyMac's improper solicitations have caused substantial damages to Bimini and Orchid. As a result of IndyMac's improper solicitations and wrongful conduct, Plaintiffs were forced to renegotiate the sale of Orchid's retail mortgage loan origination business resulting in a reduction of the purchase price by approximately $3.5 million, and were forced to retain leases for commercial office space which were no longer needed resulting in additional losses.

## THE PARTIES

5.     Plaintiff Orchid Island TRS, LLC, formerly known as Opteum Financial Services, LLC, is a majority-owned subsidiary of Bimini Capital Management, Inc., a publicly held real estate investment trust. Orchid is a Delaware limited liability company, whose principal place of business was Bergen County, New Jersey at all times prior to July 20, 2007, and whose current principal place of business is Florida. The members of Orchid are Bimini (a Maryland corporation, with its principal place of business in Florida) and Citigroup Global Markets Realty Corp. ("Citigroup") (a New York corporation, with its principal place of business in New York).

6.     Plaintiff Bimini Capital Management, Inc., formerly known as Opteum Inc., is a Maryland corporation, with its principal place of business in Florida.

7.     Defendant IndyMac Bancorp, Inc., the holding company for IndyMac Bank, F.S.B., is a Delaware corporation with its principal place of business in California.

8.     Defendant IndyMac Bank, F.S.B. is a federally chartered corporation with its principal place of business in California. Upon information and belief, Orchid's retail mortgage

- 3 -

loan origination business formerly conducted in Orchid's Northeast regional branches is now conducted by defendants, and Orchid's former employees that were previously employed in Orchid's Northeast regional branches are now employed by defendant IndyMac Bank, FSB or a related entity.

## JURISDICTION AND VENUE

9. The United States District Court for the Southern District of New York has *in personam* jurisdiction over Defendants because they conduct business in New York. In addition, the Confidentiality Agreement between the parties contains the following provision: "The parties hereby consent to the exclusive jurisdiction of, and venue in, any federal or state court of competent jurisdiction located in the Borough of Manhattan, New York City for the purpose of adjudicating any matter arising from or in connection with this Agreement." See Exhibit A, ¶14.

10. The United States District Court for the Southern District of New York has jurisdiction of this action under the jurisdictional provisions of 28 U.S.C. §1332(a) in that the matter in controversy exceeds $75,000 exclusive of interest and costs, and is between citizens of different states.

11. Venue in this district is proper pursuant to 28 U.S.C. §1391 (a).

## STATEMENT OF FACTS

12. Orchid is a majority-owned subsidiary of Bimini, a publicly held real estate investment trust. Among other things, Orchid engaged in the business of originating residential mortgage loans throughout the United States.

13. Upon information and belief, IndyMac engages in the same or similar business throughout the United States. IndyMac and Orchid were, therefore, competitors in the residential mortgage loan origination business.

- 4 -

14. In the early part of 2007, Bimini offered to sell Orchid's retail residential mortgage loan origination business. Bimini considered indications of interest from several parties, including IndyMac.

15. In order to allow IndyMac to explore a possible acquisition of Orchid's retail residential mortgage loan origination business, Bimini and IndyMac entered into a Confidentiality Agreement, dated as of March 16, 2007. Exhibit A. The Confidentiality Agreement governed the due diligence process undertaken by IndyMac.

16. Pursuant to Paragraph 1 of the Confidentiality Agreement, Bimini agreed to provide IndyMac access to "confidential and proprietary information" "solely for the purpose of evaluating a potential Transaction" between the parties. All of the materials, documents, data and information provided to IndyMac was described in the Confidentiality Agreement as "Evaluation Material."

17. Pursuant to Paragraph 2 of the Confidentiality Agreement, IndyMac agreed, among other things, "not to use any such Evaluation Material except in connection with the Transaction and to determine whether IndyMac or one of its subsidiaries or affiliates wishe[d] to enter into a Transaction and to evaluate the Transaction and the terms thereof."

18. The retail residential mortgage loan origination business is essentially a "people business." The transaction by IndyMac would have been an asset purchase, but the fixed assets pertaining to the business are limited. In reality, what was being sold was access to key Orchid sales and management employees who, based on experience, contacts, and salesmanship, generate the residential mortgage loan originations (known as "production") that made Orchid an attractive business.

- 5 -

19.     On March 28, 2007, IndyMac and Bimini entered into a non-binding Letter of Intent with respect to the contemplated transaction. Exhibit B. The Letter of Intent made clear that the "retention" of Orchid employees was a critical component of the proposed transaction. Paragraph 4 of the Letter of Intent, for example, stated that IndyMac "anticipates offering employment to substantially all employees directly involved in the Division [being sold] . . . ." and "anticipate[s] as a condition to closing of the Transaction that retention of sales employees representing a material percentage of historical retail production volume be achieved and that certain key producers accept employment agreements with IndyMac." IndyMac also stated its intention to provide Orchid employees with a "compensation and benefits arrangement . . . no less favorable than those provided by [IndyMac]."

20.     Paragraph 5 of the Letter of Intent set forth various "conditions" to any transaction, included among which were IndyMac's "reaching an agreement with sales management with respect to their ongoing roles as managers" and "retention of sales employees representing a material percentage of historical retail production volume and acceptance of employment agreements with IndyMac by certain key producers."

21.     Finally, the parties' Letter of Intent made clear that the principal focus of IndyMac's due diligence in connection with the proposed transaction was to be a review of the confidential and proprietary compensation, benefits and production information for all Orchid employees. Paragraph 7 indicated that, among other things, IndyMac's due diligence would "[s]pecifically . . . focus on" "[r]eview of loan officer and sales management compensation structures and employment contracts."

- 6 -

22.    On May 7, 2007, Bimini determined not to pursue further negotiations with IndyMac concerning a possible sale of Orchid's retail residential mortgage loan origination business, and so advised IndyMac.

23.    Bimini continued negotiations with another party for the sale of Orchid's retail residential mortgage loan origination business and, on May 7, 2007, Bimini, Orchid and Prospect Mortgage Company, LLC ("Prospect Mortgage") entered into an Asset Purchase Agreement. Bimini's agreement with Prospect Mortgage was publicly announced on May 7, 2007, and the Asset Purchase Agreement, less certain exhibits and schedules setting forth confidential and proprietary information of Bimini and Orchid, was filed with the Securities and Exchange Commission.

24.    Beginning at or about the same time the transaction with Prospect Mortgage was announced, IndyMac, utilizing the confidential information it had obtained full access to during the due diligence process, embarked upon a campaign of targeting for solicitation leading Orchid salespeople and management personnel. IndyMac actively solicited and hired a large number of such individuals. IndyMac induced several such individuals to abruptly terminate employment with Orchid and join IndyMac by, upon information and belief, offering compensation packages that IndyMac knew exceeded those currently paid by Orchid.

25.    The goal of this unlawful campaign was to obtain the benefits of the transaction IndyMac contemplated entering into with Bimini without paying for it. Under the terms of its agreement with Prospect Mortgage, should Bimini fail to deliver Orchid employees responsible, in the aggregate, for a minimum percentage of the production of the preceding 12-month period, Prospect Mortgage, at its sole option and without penalty, may choose not to proceed with the transaction. Upon information and belief, IndyMac was fully aware of this condition in the

- 7 -

agreement with Prospect Mortgage because a similar provision was contained in drafts of the asset purchase agreement negotiated between IndyMac and Bimini, and because the Prospect Mortgage agreement is on file with the SEC and thus publicly available.

26.     Since IndyMac's campaign of solicitation began, the following individuals terminated their employment with Orchid and joined IndyMac:

- John Palmiotto, Orchid's former Senior Vice President, Northeast Regional Manager. Mr. Palmiotto gave Orchid one (1) day's notice of his departure. Working directly under Mr. Palmiotto are sales personnel who, collectively, generated in excess of 20% of Orchid's production for the previous 12-month period.

- Upon information and belief, each of the individuals on the attached Exhibit C.

27.     On May 23, 2007, Bimini delivered a letter to IndyMac demanding that it immediately cease and desist from further solicitation of Orchid employees based upon IndyMac's misuse of Bimini's confidential information in violation of the Confidentiality Agreement, and demanding assurance that IndyMac would not undertake such activities in the future. Upon information and belief, IndyMac continued its unlawful solicitations subsequent to its receipt of Bimini's cease and desist letter.

28.     Plaintiffs have commenced an action in New Jersey Superior Court, Bergen County, alleging the same conduct against certain former Orchid employees who terminated their employment with Orchid and joined IndyMac contrary to their employment agreements.

29.     Under Paragraph 12 of the Confidentiality Agreement, Bimini is entitled to recover its reasonable legal fees if forced to enforce its rights thereunder.

## COUNT I
## BREACH OF CONTRACT

30.     Plaintiffs repeat and reallege each of the foregoing paragraphs of the Complaint.

- 8 -

31.     Bimini fully performed its obligations under the Confidentiality Agreement by providing IndyMac with access to confidential compensation, benefits and production information for employees of Orchid, for the sole purpose of allowing IndyMac to evaluate the merits of a potential purchase of Orchid's retail mortgage loan origination business.

32.     Under Paragraph 2(a) of the Confidentiality Agreement, IndyMac was obligated "not to use [Bimini's] Evaluation Material (as defined in ¶1 of the Confidentiality Agreement) except in connection with the Transaction and to determine whether IndyMac or one of its subsidiaries or affiliates wishes to enter into a Transaction and to evaluate the Transaction and the terms thereof."

33.     Under Paragraph 12 of the Confidentiality Agreement, IndyMac agreed and acknowledged that Bimini "may be irreparably harmed by breach of this Agreement by IndyMac, its affiliates or Representatives and that money damages may not be a sufficient remedy for any such breach and that [Bimini] may be entitled to seek equitable relief, including injunctive relief and specific performance, as a remedy for any such breach (which shall be in addition to any other remedies at law or in equity to [Bimini])."

34.     IndyMac breached the Confidentiality Agreement by misusing the Evaluation Material, specifically, confidential information concerning the compensation, benefits and sales production of key employees of Orchid, in order to solicit and induce such employees to terminate their employment with Orchid and join IndyMac. IndyMac's campaign of solicitation and inducement, made possible only through its misuse of Bimini's Evaluation Material in breach of the Confidentiality Agreement, disrupted consummation of a contemplated sale of Orchid's retail mortgage loan origination business to a third party, Prospect Mortgage.

- 9 -

35.     As a direct and proximate result of IndyMac's breach of the Confidentiality
Agreement, Plaintiffs have suffered damages.

## COUNT II
## BREACH OF IMPLIED COVENANT
## OF GOOD FAITH AND FAIR DEALING

36.     Plaintiffs repeat and reallege each of the foregoing paragraphs of the Complaint.

37.     Implied in every contract entered into in New York is a covenant of good faith
and fair dealing. The Confidentiality Agreement is governed by New York law.

38.     Bimini fully performed its obligations under the Confidentiality Agreement,
including the implied covenant of good faith and fair dealing.

39.     IndyMac breached the Confidentiality Agreement by, among other things, using
the confidential compensation information it obtained access to during the due diligence process
for a purpose never intended by the parties, namely, to induce Orchid producers and management
personnel to leave Orchid and join IndyMac (some in violation of their Employment
Agreements) just as Bimini was concluding a transaction with Prospect Mortgage for the sale of
the retail mortgage loan origination business. By doing so, IndyMac acted in bad faith and in
violation of the implied covenant of good faith and fair dealing in the Confidentiality Agreement.
IndyMac's actions were intended to and did deprive Bimini of the benefits it was entitled to
under the Confidentiality Agreement.

40.     As a direct and proximate result of IndyMac's breach, Plaintiffs have suffered
damages.

- 10 -

## COUNT III
## UNFAIR COMPETITION

41.     Plaintiffs repeat and reallege each of the foregoing paragraphs of the Complaint.

42.     IndyMac obtained access to Bimini's Evaluation Material and confidential information regarding the compensation, benefits and production of Orchid's loan officers and management personnel, solely in the course of the due diligence process.

43.     IndyMac was obligated under the terms of the Confidentiality Agreement to use such confidential information solely for the purpose of exploring the merits of a possible acquisition of Orchid's retail mortgage loan origination business and for no other purpose.

44.     IndyMac, a competitor of Orchid in the retail mortgage loan origination business, misused the confidential information to wrongfully solicit and induce Orchid employees to terminate their employment and join IndyMac.

45.     The purpose of IndyMac's actions was to harm Plaintiffs by interfering with and derailing the sale of Orchid's retail mortgage loan origination business to Prospect Mortgage, a transaction that IndyMac had hoped to consummate with Bimini.

46.     IndyMac's intent and actions are wrongful and constitute unfair competition.

47.     As a direct and proximate result of IndyMac's conduct, Plaintiffs have suffered damages.

## COUNT IV
## AIDING AND ABETTING OF
## BREACH OF FIDUCIARY DUTIES

48.     Plaintiffs repeat and reallege each of the foregoing paragraphs of the Complaint.

49.     Under New York law, a third party who knowingly aids and abets an agent of another in breach of fiduciary duty is liable to the principal.

- 11 -

50.     IndyMac used Evaluation Material and confidential information regarding key Orchid employees, including compensation, benefits and performance records, that IndyMac obtained during negotiations with Bimini and that was subject to a strict confidentiality agreement, to aid and abet the Orchid employees in breaching their fiduciary duties and duty of loyalty to Orchid and breaching their Employment Agreements, by raiding Orchid's northeast branch offices of all of its employees.

51.     IndyMac is chargeable with knowledge that the Orchid employees, as managers and employees of Orchid, owed fiduciary duties and a duty of loyalty to Orchid as their employer.

52.     IndyMac participated in the Orchid employees' breach of their fiduciary duties and duty of loyalty to Orchid by soliciting and hiring the Orchid employees' subordinates and by using the confidential and proprietary information obtained by the Orchid employees during their employment with Orchid.

53.     IndyMac is liable for the proximate consequences of the Orchid employees' breach of their fiduciary duties and duty of loyalty and breach of Employment Agreements, which inured to IndyMac's benefit.

54.     As a direct and proximate result of IndyMac's conduct, Plaintiffs have suffered damages.

## COUNT V
## TORTIOUS INTERFERENCE WITH CONTRACT

55.     Plaintiffs repeat and reallege each of the foregoing paragraphs of the Complaint.

56.     IndyMac misused Plaintiffs' confidential information to wrongfully solicit and induce Orchid employees to terminate their employment and breach their Employment Agreements with Orchid and join IndyMac.

- 12 -

57.    The purpose of IndyMac's actions was to harm Bimini by interfering with and derailing the sale of Orchid's retail mortgage loan origination business to Prospect Mortgage, a transaction that IndyMac had hoped to consummate with Bimini.

58.    IndyMac's intent and actions were wrongful and constitute tortious interference with contract.

59.    As a direct and proximate result of IndyMac's conduct, Plaintiffs have suffered damages.

## COUNT VI
## TORTIOUS INTERFERNCE WITH
## PROSPECTIVE ECONOMIC ADVANTAGE

60.    Plaintiffs repeat and reallege each of the foregoing paragraphs of the Complaint.

61.    IndyMac misused Plaintiffs' confidential information and Evaluation Material to wrongfully solicit and induce Orchid employees to terminate their employment with Orchid and join IndyMac.

62.    The purpose of IndyMac's actions was to harm Bimini by interfering with and derailing the sale of Orchid's retail mortgage loan origination business to Prospect Mortgage, a transaction that IndyMac had hoped to consummate with Bimini.

63.    IndyMac's intent and actions are wrongful and constitute tortious interference with prospective economic advantage.

64.    As a direct and proximate result of IndyMac's conduct, Plaintiffs have suffered damages.

WHEREFORE, Plaintiffs hereby demand judgment against IndyMac as follows:

(a)     awarding Plaintiffs compensatory damages in such sum as shall be proved

at trial, plus interest as provided by law;

(b)     awarding Plaintiffs punitive damages;

(c)     awarding Plaintiffs interest as provided by law;

(d)     awarding Plaintiffs the costs of suit and reasonable attorneys' fees; and

(b)     awarding Plaintiffs such other relief as the Court deems just and proper.

EDWARDS ANGELL PALMER & DODGE LLP
750 Lexington Avenue
New York, New York 10022
(212) 308-4411

By:

Robert Novack
Attorneys for Plaintiffs

Dated: October 25, 2007

- 14 -

## CONFIDENTIALITY AGREEMENT

This Confidentiality Agreement, dated as of March 16, 2007 (this "Agreement"), is made between **Opteum Inc.** (the "Company"), and **IndyMac Bancorp. Inc.** ("IndyMac") (each a "Party," and collectively, the "Parties"). Each reference to a Party and/or the Parties shall be deemed to refer to such Party or Parties, together with its or their subsidiaries or affiliates.

1. In connection with the Parties' consideration of a potential acquisition by IndyMac or one of its subsidiaries or affiliates of the operating platform, residuals, servicing rights and/or other assets relating to the subprime/prime/alt-a residential mortgage origination business of the Company, its subsidiaries or affiliates (the "Transaction"), the Company is prepared to provide certain confidential and proprietary information to be used solely for the purpose of evaluating a potential Transaction. All such information (whether in written, oral, digital or other tangible or intangible form) provided by or on behalf of the Company, its subsidiaries or affiliates, relating to the Company, its subsidiaries or affiliates, on or after the date hereof, which includes but is not limited to information regarding the Company's, its subsidiaries' or affiliates' consumer or business customers, together with any reports, analyses, data, studies, interpretations, forecasts, compilations, memoranda, notes and any other writings (regardless of form) prepared by IndyMac or any of its subsidiaries, affiliates or Representatives (as defined herein) which contain, reflect or are based, in whole or in part, upon such information, is herein collectively referred to as "Evaluation Material".

2. To maintain the confidentiality of the Evaluation Material, IndyMac agrees: (a) not to use any such Evaluation Material except in connection with the Transaction and to determine whether IndyMac or one of its subsidiaries or affiliates wishes to enter into a Transaction and to evaluate the Transaction and the terms thereof; (b) to hold the Evaluation Material in confidence and (c) not to disclose any such Evaluation Material, other than to the officers, directors, employees, agents and representatives of IndyMac, its subsidiaries or affiliates and any of their respective advisors or to such other persons to whom the Company has given prior approval in writing (collectively, "Representatives") with a need to know the information contained therein in connection with the Transaction and *provided*, that IndyMac agrees to inform its Representatives of the terms hereof and to be responsible for any breach of this Agreement by any of its Representatives.

Additionally, except as provided herein, the Parties hereto agree not to disclose to any individual or any corporation, limited liability company, partnership, association, proprietorship, firm or other entity: (i) the fact that Evaluation Material has been made available by the Company, its subsidiaries or affiliates; (ii) the fact that any discussions or negotiations are taking place between the Parties concerning a possible Transaction; or (iii) any of the terms, conditions, or other facts with respect to any possible Transaction, including the status thereof or the subject matter of this Agreement. The Parties further agree the information that is the subject of the obligation contained in this paragraph shall be permitted to be disclosed in the same instances where Evaluation Material may be disclosed under the first paragraph of Section 2, Section 3, Section 4 and Section 5 of this Agreement; provided that each of the above listed sections shall be read as if the obligations contained therein apply equally to the Parties hereto with respect to the information that is the subject of the obligation contained in this paragraph.

**EXHIBIT A**

3.  This Agreement shall be inoperative as to particular portions of the Evaluation Material of the Company, its subsidiaries or affiliates if such information (i) is or becomes generally available to the public other than as a result of a disclosure by IndyMac, its subsidiaries, affiliates or Representatives in violation of this Agreement, (ii) was known to or in the possession of IndyMac, its subsidiaries, affiliates or Representatives prior to its disclosure hereunder, (iii) which is obtained by IndyMac, its subsidiaries, affiliates or Representatives from a third person who, insofar as is known or reasonably should be known by IndyMac, its subsidiaries, affiliates or Representatives, is not prohibited from transmitting the information by a contractual, legal or fiduciary obligation to the Company, its subsidiaries or affiliates (iv) is independently developed by IndyMac, its subsidiaries, affiliates or Representatives without reliance on Evaluation Material or (v) is approved for release by the Company prior to the disclosure in writing.

4.  If IndyMac or its Representatives are requested or required (by oral questions, interrogatories, requests for information or documents, subpoena, civil investigative demand, deposition, regulatory request or similar process) to disclose any Evaluation Material or any information relating to IndyMac's or its Representative's opinion, judgment or recommendations concerning its review as developed from the Evaluation Material, it is agreed that IndyMac will provide the Company with prompt written notice of such request(s) or requirement, if reasonably practicable and to the extent permitted by law, so that the Company may seek an appropriate protective order and/or waive compliance with the provisions of this Agreement. If, failing the entry of a protective order or the receipt of a waiver hereunder, IndyMac or its Representatives are, upon the advice of counsel, compelled to disclose Evaluation Material, IndyMac or its Representatives may disclose only that portion of such Evaluation Material as counsel advises such party, is required to disclose or reasonably requested by a regulator. IndyMac agrees not to oppose action by the Company to obtain an appropriate protective order or other reliable assurance that confidential treatment will be accorded the Evaluation Material.

5.  Notwithstanding anything herein to the contrary, IndyMac and its subsidiaries, affiliates and Representatives and the Company and its subsidiaries, affiliates and Representatives agree that they (and their employees, representatives, and other agents) may disclose to any and all persons, without limitation of any kind from the commencement of discussions, the U.S. federal and state income tax treatment and tax structure of the Transaction and all materials of any kind (including opinions or other tax analysis) that are provided to it relating to the tax treatment and tax structure of the Transaction. For this purpose, "tax structure" is limited to facts relevant to the U.S. federal and state income tax treatment of the Transaction and does not include information relating to the identity of the parties, their affiliates, agents or advisors.

6.  The Company acknowledges that IndyMac and/or any of its subsidiaries or affiliates may be considering, and may in the future consider, business ideas, products and technologies similar to or the same as that of Company, its subsidiaries and/or affiliates. Except for the obligation of IndyMac, its subsidiaries, affiliates and Representatives to keep Evaluation Material confidential in accordance with the terms of this Agreement, nothing in this Agreement shall prevent IndyMac or any of its subsidiaries or affiliates from pursuing any such ideas or pursuing businesses similar to or related to that of the Company or any of its subsidiaries or affiliates, either internally or through investments in or representation of third parties. Furthermore, IndyMac and/or any of its subsidiaries or affiliates may use Residuals for any purpose, including without limitation, use in development, manufacture, promotion, sale and maintenance of any

products or services. The term "Residuals" means any ideas, concepts, know-how and techniques contained in Evaluation Materials that is retained in the unaided memories of any of IndyMac's, its subsidiaries' or affiliates' Representatives who have had access to the Evaluation Material under the terms of this Agreement. A person's memory is unaided if the person has not intentionally memorized the relevant information.

7. The Parties agree that no contract or agreement providing for any Transaction shall be deemed to exist between the Parties unless and until the Company or one of its subsidiaries or affiliates and IndyMac or one of its subsidiaries or affiliates execute and deliver a final definitive agreement relating thereto (a "Transaction Agreement"), and the Parties hereby waive, in advance, any claims (including, without limitation, breach of contract) in connection with any Transaction unless and until the Company or one of its subsidiaries or affiliates and IndyMac or one of its subsidiaries or affiliates shall have executed and delivered a Transaction Agreement. The Parties also agree that unless and until the Company or one of its subsidiaries or affiliates and IndyMac or one of its subsidiaries or affiliates shall have executed and delivered a Transaction Agreement, no Party will be under any legal, financial or other obligation of any kind whatsoever with respect to a Transaction by virtue of this Agreement except for the matters specifically agreed to herein. The Parties further acknowledge and agree that each Party reserves the right, in its sole discretion, to reject any and all proposals made by the other Party or its Representatives with regard to a Transaction, and to terminate discussions and negotiations at any time. Nothing herein shall obligate the Parties to enter into a Transaction Agreement.

8. If at any time the Company requests, IndyMac, its subsidiaries, affiliates and Representatives shall promptly destroy all Evaluation Material, whether in tangible or intangible form, that has been delivered or disclosed to any of them by or on behalf of the Company, its subsidiaries and affiliates, including, without limitation, any tangible or intangible Evaluation Material that may be found in analyses, compilations, studies or other documents prepared by IndyMac, its subsidiaries, affiliates or Representatives, unless such destruction is not (i) permitted by law, rule, regulation or by any competent judicial, governmental, supervisory or regulatory body; or (ii) reasonably practicable, with respect solely to electronic data, given the limitations on the permanent destruction of electronic data located on information technology systems. In the case of Evaluation Material that is not destroyed pursuant to clause (i) or (ii) of the immediately preceding sentence, such Evaluation Material shall be kept confidential in accordance with the terms of this Agreement.

9. This Agreement contains the entire agreement between the Parties concerning confidentiality of the Evaluation Material and the matters described herein. Neither this paragraph nor any other provision in this Agreement can be waived or amended except by the express written consent of each Party hereto, which consent shall specifically refer to the waived or amended provision.

10. The terms and conditions of this Agreement will remain in effect for a period of twelve (12) months from the date hereof.

11. It is understood and acknowledged that the Company may be irreparably harmed by breach of this Agreement by IndyMac, it affiliates or Representatives and that money damages may not be a sufficient remedy for any such breach and that the Company may be entitled to seek equitable relief, including injunctive relief and specific performance, as a remedy for any such

☑005/007

breach (which shall be in addition to any other remedies at law or in equity to the Company). If it should become necessary to enforce this agreement in any forum, the Company shall be entitled to recover reasonable legal fees incurred.

12. If any provision of this Agreement is held to be unenforceable for any reason, it shall be modified rather than voided, if possible, in order to achieve the intent of the Parties to the extent possible. In any event, all other provisions of this Agreement shall be deemed valid and enforceable to the extent possible. It is understood and agreed that no failure or delay by a Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or future exercise thereof or the exercise of any other right, power or privilege hereunder.

13. This Agreement shall be governed by the laws of the State of New York, without reference to that state's conflict of law principles.

14. The Parties hereby consent to the exclusive jurisdiction of, and venue in, any federal or state court of competent jurisdiction located in the Borough of Manhattan, New York City for the purposes of adjudicating any matter arising from or in connection with this Agreement. THE PARTIES UNCONDITIONALLY WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL FOR ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF, DIRECTLY OR INDIRECTLY, THIS AGREEMENT AND/OR THE CONFIDENTIAL INFORMATION. Each of the Parties represent and warrant that this waiver has been reviewed and each of the Parties knowingly waives jury trial rights following consultation with legal counsel. In the event of litigation, a copy of this Agreement may be filed as a written consent to trial by the court.

15. This Agreement may be executed simultaneously in any number of counterparts. Each counterpart shall be deemed to be an original, and all such counterparts shall constitute one and the same agreement.

16. Notwithstanding anything in this Agreement to the contrary, each Party shall comply with all privacy and data protection laws, rules and regulations which are or which may in the future be applicable to the terms of this Agreement. Without limiting the generality of the preceding sentence, each Party agrees that it will not use nor disclose to any other party any nonpublic personal information which it receives from a financial institution in connection with this Agreement, except in accordance with this Agreement. For purposes of this subsection, the terms "nonpublic personal information" and "financial institution" shall have the meanings set forth in Section 509 of the Gramm-Leach-Bliley Act (P.L. 106-102) (15 U.S.C. Section 6809) and implementing regulations thereof ("GLB").

17. This Agreement grants no patent rights, copyrights, trade secrets or licenses, expressed or implied, to either Party except to the extent necessary for a Party to perform the evaluation contemplated by this Agreement.

18. Each Party agrees not to export any Evaluation Material, or articles incorporating any Evaluation Material, to any prohibited country, as designated by the U.S. Department of Commerce, without the appropriate written authorization.

☒006/007

**19.** Neither this Agreement nor any rights or obligations hereunder may be assigned by either Party hereto without the prior written consent of the other Party, such consent not to be unreasonably withheld. This Agreement shall inure to the benefit of and be binding upon the Parties hereto and their respective successors and assigns.

**20.** Each Party acknowledges that they are aware that the United States securities laws prohibit any person who has received material, non-public information concerning the matters which may be the subject of this agreement from purchasing or selling any securities of either Party to this Agreement or from communicating such information to any other person under circumstances in which it is reasonably foreseeable that such person is likely to purchase or sell such securities.

(The remainder of this page has been intentionally left blank)

☑007/007

IN WITNESS WHEREOF, the undersigned have duly executed this Confidentiality Agreement
as of the date first written above.

OPTEUM INC.

By:

Name: Jeffrey J. Zimmer
Title: Chairman, President and Chief Executive Officer

INDYMAC BANCORP. INC.

By:

Name: Greg Garrabrants
Title: SVP, MCA

@002/006

03/28/2007 17:30 FAX

March 28, 2007

Mr. Jeffrey J. Zimmer
President, Chief Executive Officer
Opteum Inc.
3305 Flamingo Drive
Vero Beach, FL 32963

STRICTLY PRIVATE AND CONFIDENTIAL

SUBJECT TO CONTRACT

Dear Mr. Zimmer:

We are pleased to submit this non-binding, preliminary indication of interest of IndyMac
Bancorp, Inc., ("Indymac" or "we") to enter into an acquisition transaction (the "Transaction")
involving the purchase of 100% ownership of the Retail Division ("Division") of Opteum
Financial Services, LLC (the "Company") a wholly-owned subsidiary of Opteum Inc. (the
"Parent"). We are excited about the prospect of working together to complete the potential
Transaction.

### 1. Deal Structure and Scope of Transaction

The Transaction includes the purchase of all fixed and related net assets of the Division and
assumption of all office and equipment leases associated with the Division. Indymac will
purchase and assume all rights and obligations associated with the Division's pipeline of
loans and, at the Company's option, purchase the Division's uncommitted current retail loan
inventory.

We will finance the transaction with cash. We do not anticipate the need to raise external
funding nor do we expect to include a financing contingency in the acquisition agreement.

### 2. Purchase Price

We have reviewed the confidential information provided by the Company and based on this,
our indicative value range is a $4 - $6 million premium to the current book value of branch
fixed assets and net operating assets of the Division.

To arrive at our preliminary valuation, we have assumed that we will be able to rationalize
corporate costs allocated to the Division over the intermediate term to an industry normalized
level (calculated on a per loan basis).

Our final valuation will be dependent primarily upon development of a greater understanding
of the cost structure that could be achieved by combining the Division's operations with
Indymac's existing retail operations.

EXHIBIT B

Ø003/006

Mr. Jeffrey J. Zimmer
March 28, 2007
2

### 3. Strategic Fit and Organizational Integration

We believe that Indymac is a strong strategic fit for the Company for the following reasons:

- *Indymac Is Strongly Committed To Field Retail:* Indymac is strongly focused on developing store front retail as a component of its core strategy and will continue to devote the necessary resources to build on and accelerate the Company's success. For example, on February 7, 2007, Indymac announced the signing of a definitive agreement to acquire the retail mortgage banking assets of New York Mortgage Trust, a $2 billion store front retail origination platform located in the Northeast.
- *Ability To Leverage Indymac's Company Infrastructure To Reduce Costs:* By utilizing Indymac's back office infrastructure, the Division's management can focus on growing its retail business.
- *Federal Preemption Through Bank Charter:* The Company can rely on Indymac's bank charter for preemption from state licensing to reduce its administrative burdens.

### 4. Employees

Indymac anticipates offering employment to substantially all employees directly involved in the Division, it being understood that the elimination of certain duplicative back-office functions may be necessary to achieve the financial returns supporting the purchase price premium.

We would anticipate as a condition to closing of the Transaction that certain members of the sales management team enter into long-term contracts with Indymac. These contracts would typically span three years.

Additionally, we anticipate as a condition to closing of the Transaction that retention of sales employees representing a material percentage of historical retail production volume be achieved and that certain key producers accept employment agreements with Indymac.

Based upon our review of the 2006 compensation information disclosed in the Company-provided documents, we believe that our compensation and benefits arrangement would be no less favorable than those provided by the Company.

We are comfortable providing benefits eligibility immediately upon consummation of the acquisition.

### 5. Conditions

Our final proposal would be subject to: (a) reaching an agreement with sales management with respect to their ongoing roles as managers of the Company; (b) retention of sales employees representing a material percentage of historical retail production volume and acceptance of employment agreements with Indymac by certain key producers; (c) negotiation of a satisfactory asset purchase and sale agreement; (d) completion of due diligence, including visits to Company locations, further meetings with management,

Mr. Jeffrey J. Zimmer
March 28, 2007
3

execution of compliance reviews, review of assets/liabilities to be assumed, and further work
concerning the financial, legal, and tax aspects of the Division and the proposed Transaction.

You have expressed a desire for strong certainty of closing. Given that we will not require a
financing condition, we anticipate that closing conditions can be kept to a minimum and
provide you strong certainty of closing subsequent to signing a definitive agreement.

### 6. Description of the Buyer

Indymac Bancorp, Inc. (NYSE:NDE) is the holding company for IndyMac Bank, F.S.B., a $29
billion asset company, the 7th largest savings and loan and the 2nd largest independent
mortgage lender in the nation. Indymac Bank, operating as a hybrid thrift / mortgage banker,
provides cost-efficient financing for the acquisition, development, and improvement of single-
family homes. Indymac also provides financing secured by single-family homes and other
banking products to facilitate consumers' personal financial goals.

With an increased focus on building customer relationships and a valuable consumer
franchise, Indymac is committed to becoming a top five mortgage lender in the U.S. by 2011,
with a long-term goal of providing returns on equity of 15 percent or greater. The Company is
dedicated to continually raising expectations and conducting itself with the highest level of
ethics.

As a federally chartered and insured savings and loan association, Indymac is subject to
regulation, supervision and periodic examination by the OTS and the FDIC.

### 7. Due Diligence

We will work expeditiously to quickly reach resolution on key business due diligence issues
that may impact our interest in consummating the Transaction and our estimate of value.
Specifically, our business due diligence will focus on:

- Sales management interest and fit in joining Indymac
- Compliance reviews, including loan-level file reviews and repurchase activity
- Review of loan officer and sales management compensation structures and
  employment contracts

In refining our view of management interest, we plan to have our senior business leaders
meet with the Division's regional sales management and top producers on Monday, April 2nd
in Pasadena, California.

In order to fully complete our business due diligence, we will require continual access to
market, operating, customer and financial information that is customary for transactions of
this type. We expect that our additional business due diligence will focus on visiting a
selected number of branch locations, analyzing the potential opportunities to consolidate
corporate and back-office operation, and compliance and repurchase reviews. We would
anticipate that the business due diligence process would take 5-10 business days. After we

☒005/006

Mr. Jeffrey J. Zimmer
March 28, 2007
4

have completed our business due diligence, we will be prepared to agree on a term sheet, conduct final and confirmatory diligence, and negotiate a final Asset Purchase Agreement ("APA"). We estimate being able to reach agreement on a final APA by April 30, 2007 and closing the transaction in Q2 2007.

## 8. Transition Services

In our business due diligence, we will evaluate any transitional services that the Division would require from the Company to ensure a smooth transition.

[Area left blank intentionally]

☑006/006

Mr. Jeffrey J. Zimmer
March 28, 2007
5

### 9. Contact Information

Please direct clarifying questions regarding this preliminary indication of interest to:

Mr. Gregory Garrabrants
Senior Vice President
Head of Mergers & Acquisitions
626-535-6839 (office)
818-800-0994 (cell)
626-432-8872 (fax)
greg.garrabrants@Indymacbank.com

or our financial advisor:

Mr. Jeffrey M. Levine
Managing Director
Milestone Advisors, LLC
305-579-2001 (office)
305-297-3411 (cell)
jlevine@milestonecap.com

We look forward to working with Opteum and your financial advisors at Deutsche Bank on this transaction.

Very truly yours,

Ashwin Adarkar
CEO New Business Incubation, Organizational Effectiveness and M&A

cc: Kevin McCann, Deutsche Bank

## Exhibit C

| | | |
|---|---|---|
| Fawne | Berkowitz | Loan Officer Assistant |
| Tobi-Ann | Bladzinski | Processing Supervisor |
| William | Boone III | Sales Manager |
| Julie | Branch | Executive Assistant |
| Edward | Brehm Jr. | Branch Manager |
| Edward | Brehm Sr. | Branch Manager |
| Takisha | Carter-Holmes | Processor, Certified |
| Trisha | Clancy | Processor |
| Richard | Daesener | Loan Officer |
| Georgene | Deandrea | Loan Officer, Jr |
| Sharon | Dellay | Branch Manager |
| Joseph | Dunsavage | Sales Manager |
| Kaleema | Emanuel | Processor |
| Jeffrey | Fass | NE Director of Affinity Relationships |
| Michael | Galanti | Loan Officer |
| Tiffany | Gould | Loan Officer Assistant |
| Gerald | Green | Branch Manager |
| Vivian | Guidetti | Processor |
| Derek | Hasulak | Loan Officer |
| Karen | Hofmeister | Processor |
| Steven | Horowitz | Loan Officer |
| Wayne | Hunter | Loan Officer |
| Walter | Jacobsen | Loan Officer |
| Craig | Kowalski | Branch Sales Manager |
| Steven | Luzzi | Loan Officer, Jr |
| Craig | Magnani | Loan Officer |
| Despina | Mantagas | Loan Officer |
| Margo | Nichols | Loan Officer |
| Mark | Pfeifer | Loan Officer |
| Daniel | Quaintance | Loan Officer |
| Michael | Rivera | Loan Officer, Jr |
| Paul | Rizzuto | Loan Officer |
| Michelle | Rosenthal | Loan Setup Specialist |
| Michael | Schlegel | Loan Officer |
| Marie | Sciarra | Loan Officer |
| Peter | Simko | Loan Officer |
| Michael | Smurro | Loan Officer |
| Rose | Soutelo | Processor |
| Chris | Stanton | Branch Manager |
| Jeff | Stanton | Loan Officer |
| Anne | Statiroudis | Operations Manager |
| Donna | Stewart | Loan Officer |
| Brian | Stokes | Loan Officer, Sr |
| Adeline | Torres | Loan Officer, Jr |

| | | |
|---|---|---|
| Joseph | Urciuoli | Loan Officer |
| Claudia | Valencia | Loan Officer Assistant |
| Janet | Vitabile | Processor, Sr |
| Peter | Vitabile | Loan Officer, Sr |
| Darrell | Washington | Loan Officer, Jr |
| Irene | Wilder | Loan Officer |
| John | Wilson | Loan Officer |